of the United States Court of Appeals, in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this honorable court. Good morning ladies and gentlemen. The first case this morning is the United States v. Haas. Mr. Henderson. Good morning. May it please the court. My name is Peter Henderson. I represent Robert Haas today. The four issues that we've raised in our brief have, I think, one thing in common, which is that we are emphasizing adhering to the actual text of the statutes and the guideline, rather than conflating them with similar but different statutes found elsewhere in the criminal code. So I'd like to start today with the discussion of counts one through three, the violations of section 115a, because it's important not to conflate those with a similar threat statute, section 875. When we're dealing with multiplicity issues, we're concerned with the unit of prosecution, and Congress needs to clearly articulate the unit of prosecution, or else we will read the statute in a way that favors the defendant under sort of a supercharged rule of lenity. And the way that Congress writes these statutes is related, of course, to the jurisdictional basis for the statutes. Mr. Henderson, before you get too far down this line, the thing that brings me up short about your argument is the language of the companion subsection in 115 to a1b, which is 115b, which talks about a threat made in violation. It doesn't talk about, you know, when a person has been the subject of threats or something. So I look at that, and it appears to me that the threat is the unit of prosecution, not, you know, a focus on a particular individual. I think that at best produces an ambiguity, as we've sort of outlined in our reply brief, because to sort of nominalize the verb from subsection a, we would say a threat, we would say a homicide or a murder, we would say a kidnapping, when those other verbs, of course, can involve multiple acts and furtherance. So, for example, if somebody were to fire two shots that independently each would kill a federal official, that's not two counts of murder, that's one count of murder, because there was a homicide. I think the nominalization into a threat is, well, what is the threat? The threat was Mr. Haas would assault Mr. Officer Kostovsky in retaliation for his official duties. That was the threat. He communicated that threat several times, and so the government, for example, appropriately charged all of these statements, all the times that he communicated that threat on the way to Chicago in count five, because those were all, they all were separate statements, they all could be independent bases for liability, but they were part of the same ongoing course of conduct that concerned itself with a threat, the several times. I think that's what the D.C. Circuit reasoned in the Klatt case, where looking, I think, in part to the penalty structure, saying, look, threatening the Chief Justice of the United States and the Clerk of the Supreme Court is very serious, but repeatedly doing it doesn't add the sort of aggregate harm that would make it as serious as actually assaulting them or actually kidnapping. But the most I can take from this is that you do need to see when a threat, if you will, is finished. I mean, there could be numerous threats, and let's look for a second at threat number one, which is an entirely different date from the other two threats, and so surely there's a way that you can say, okay, you've made this threat on whatever day, and now some time has passed. Reminds me of like burglary cases, where are you just in one big spree of burglary, or are you robbing this store, and then you have time to stop and reflect, and then you're robbing the next store, and so forth. I mean, you still need to decide when the threat has fully been issued, and so the government here has understood these threats made at different times to be different threats, even though, as you say, on the ride up to Chicago, maybe it was just one big continuous conversation. It's certainly a fact-specific inquiry. What I would point to is, I think that you need some evidence that these threats were somehow, that there's some intervening event, or that they are related to something else. For example, if after the first text message had come in, Officer Kossovsky had done something, or even responded, and that had provoked a further response, maybe then we have an intervening sort of event. If the threat addresses other subjects, if the next statement comes in and it threatens not just Kossovsky, but his wife, if we have a statement that relates to a different subject, and it's in retaliation for something else, we have some evidence that there is some break here. Mr. Anderson, wouldn't the break be hitting the send button? Judge Wood has pointed out that two occurred on different days. There's also two that are 27 minutes apart. There could have been a reconsideration after that first text to not send the second text, and that was the intervening event. Right, but you could say the same thing about the statements in the squad car. I mean, once you've said it and sat back in your seat, you don't need to keep talking. I mean, you have the opportunity to reconsider. It's not just that you've done something that establishes liability. If we look, for example, to the bank fraud statute, once you've executed the scheme, continually taking out money that derives from that scheme isn't a new offense, even though, of course, you could stop it and point. The point is, is it substantively, is it chronologically close to that original execution? Because if so, then it's going to be one offense. For all we know, these text messages sat on Officer Kossovsky's phone, and he reviewed them all at once. So the effect on, this is a sort of victim-centered statute, the effect on Kossovsky was the same as if they'd all come in at once. But we don't know that. And the thing is, a single threat, you know, like, let's take number two, the two that were separated even by the 27 minutes, a single threat, you might think, okay, you know, this guy's just venting or something. But if somebody is repeatedly issuing similar, though not identical, threats relating to the various grounds that it, this, when the statute says a threat made in violation shall be punished by certain things, why could Congress not say that each threat is an independent injury to the threatened individual? Because Congress didn't use the word communication. The ambiguity is in what does a threat mean? How can there be a threat with no communication? Are you saying that 115A1 doesn't imply by using the word threat that there's some communication to the victim? No, I think that there is a communication, but so contrast section 115 with section 875. Section 875, Congress didn't say threat. It is communicate. It's an actual communication. We see the word communication. As the courts have sort of struggled with the guidelines, a threat, the existence of a threat, does not mean a communication. The discrete unit of, you know, it's, again, it's the contrast between mail fraud and bank fraud. Mail fraud is just, you put it in the mail. That's the unit of prosecution. But we use different language and statutes. And here, my reading of, my best reading of threat is, what is the threat? There is a threat that Robert Haass is going to assault Officer Kostahovsky. That's the threat. Now, you could also say, no, the threat means the statement. That the threat is actually the communicated statement. Made with the prohibited intent. Right, right. So there's ambiguity. Congress, I don't think, has clearly expressed it. The thing that tips it over the line, in my view, is the penalty structure. Let's discuss that a bit, Mr. Henderson. Under B1, the punishment for an assault in violation of this, and it goes through four examples, talking about the assault, and then either terming it simple. Only one of those four mentions the victim, correct? The second says physical contact with the victim? I trust that that's the case. So is your argument with regard to the penalty structure being victim-centered, based upon the degree of impact? Is that, I'm trying to follow your point here about the penalty structure informing A1, and what about the way that the penalty structure is drafted makes it victim-centered versus just a threat? Well, because we look at, we look essentially to the aggregate harm to the victim. So if it results in death, then we get the highest penalty. If it results in serious bodily injury, then we get the next highest penalty. If it results in bodily injury, we get the next highest. And then if it's just a simple assault, we get 10 years. A threatened assault is six years. So it's not sensible to say 10 text messages sent hypothetically, sent in quick succession, should lead to double the liability of actually seriously injuring a federal official. It's just not the same level of harm. You're asking us to concentrate on the impact on the victim. The beginning of each of those subsections does talk about what the offender allegedly did, the assault, correct? And it uses the singular, correct? That's right. But, and this gets back to our earlier point, it certainly focuses on what the offense is. But when we nominalize the verbs, when we talk about, go from assaults, kidnaps, etc., to what's the penalty for each criminal act, we talk about the assault. Well, the assault might have involved five punches. That's one assault. It happens in a the result of the assault is what Congress was focused on. Did that assault involve serious bodily injury, near bodily injury, or was it just an assault? One wouldn't be punished five times for five punches that at the end of the day all resulted in bodily injury. That would be one assault on an officer. But you would be punished for, you know, if you punched the officer, you know, at 12 o'clock noon and then an hour goes by and you come back and you punch the officer again, that's two assaults, right? No, I agree with that. And so the question is, it's a fact-specific one, but is there evidence to suggest that these are substantively and chronologically separate? And our view is writing the same statement over text message separated by 30 minutes is no different than saying the same statements in a squad car separated by 30 minutes. It's part of the same conversation, it's just nowadays we have those conversations over text message. Why don't I turn to counts 6 through 13 briefly. I wanted to talk to you for a minute about the interstate commerce argument that you're making. This is plain error review, I think, at best for you. And that's what worries me about it, because if at the trial this particular argument that you're making now, which is that foreign commerce is different from interstate commerce, I'm very sympathetic to that notion in general, but there seems to be evidence in this record that if the government had realized that it needed to make a better record on this, it easily could have done so. And that evidence to me is the fact that the Simon Wiesenthal Center gets involved. They pick up these posts on the internet. So even before we get to a sweeping holding, which I realize there's a conflict in the circuits about, that internet always equals interstate commerce, it probably does as a technical matter. You know, not that I'm like a techno-genius about the way the internet works, I'm certainly not, but I feel like the way it actually works isn't just like somebody carrying a message from point A to point B. Things get broken down, they get sent in packets, they get moved to different servers, and so on and so forth. But I'm worried about the plain error, because it seems to me this record shows interstate commerce, even though the posting, I'll assume that the posting on a Russian website might not be interstate, it might be foreign. And so that's why we focused first in our brief on the constructive amendment, because the question is how did the government choose to prove the case? And the way that the government chose to prove it was to introduce evidence of transmission in foreign commerce. Well they certainly did that, but I'm just, because it's plain error review, is there some grave miscarriage of justice if the record in fact shows that what we would all recognize as interstate commerce was also happening? You know, California, the last I checked, is not a foreign country. So, you know, we we know that there is interstate commerce too. Right, so the constructive, I mean it's a violation of the Fifth Amendment right to have the grand jury find those, I understand you should be tried only for that, but okay. Yeah, to address the Simon Wiesenthal point, I don't think that that is part of the offense, because Mr. Haas did not transmit a threat to the Simon Wiesenthal Center. He transmitted a threat in foreign commerce to a server, to the VK forum, and it was available on that forum, but I don't think that we're going to, I can't remember the timing of, and I'm not sure it's in the record, of when the center found that post. It's a couple days, it's a little bit later than the posting in Russia, as I recall. Right, but I think the government would agree the offense is done as soon as Mr. Haas hit send. But you don't think a rational person could look at this and say, once you've posted something, pretty much on any site, some of his threats were to very large groups of people, like all Jews, or like all federal employees, or people who like Jewish people, or whatever. So you don't think it's pretty clear that he intends to have these threats disseminated to the target groups? No, I don't think it's clear. I think he's posting angry invectives on the internet. I don't think, it's to this particular forum. It's for readers of this forum who I think he thinks will have a camaraderie with him. He posts in English, I assume. He's posting in English, not Russian. That's right. I'm not sure the evidence exactly explains the whole context. But what I'd say is, posting something to a particular site should not subject you to liability for anybody who, at any time in the future, may come across that site. I think that that essentially makes Section 875 incredibly broad and subjects internet speech to, you know, what happened in this case, I think the defense was, look, I didn't, these weren't true threats. This is me venting on the internet. Now the jury rejected that, but when we have this type of language, it's a triable issue at least, and it's going to subject a lot of people who are putting angry thoughts into forums that they think may not go any further than that to federal prosecution. So I don't think the Simon Wiesenthal bit establishes interstate commerce. And the point from Sterone, of course, was that even when you present both, if one of them's not in the jurisdiction, you haven't alleged, and it's likely that the jury convicted based on that jurisdictional hook. That's a constructive amendment. So when we look at the Ramirez case, for example, it was the same offense that was charged, possession of firearm and furtherance of a drug trafficking crime. It's just that the government relied so heavily on a different drug trafficking crime that it was a plain error. It was a crime that was not a crime. So I think the court spent a few seconds on the guidelines. Section 3D1.2B, again, by its plain text, we're looking for the same victim and two or more acts connected by a common criminal objective. I think the government agrees with the second of those. There's a common criminal objective here. Victim has a very particular definition, and so we would ask the court to look at that definition in application 02. The government doesn't discuss it, but it really is meant to refer to particular people, not whole groups of people. With that, I'll reserve what time I have for rebuttal. Thank you. Thank you, Mr. Anderson. Ms. Kelly? May it please the court. My name is Erin Kelly, and I represent the United States. This court should affirm defendant's convictions and sentence in this case. The district court properly concluded that counts one, two, and three were not multiplicities. Consistent with the statutory text of section 115, each of counts one through three charged a separate threat, a text message sent by the defendant to a federal law enforcement officer with intent to impede or to instruct the officer's duties. Each count corresponded to a separate threatening communication. So how far are you going to take that? I mean, we have these two that are just 27 minutes apart. Sometimes, you know, do you think it's every time you hit the send button? Maybe my experience is unusual, and I know people who are very verbose, but, you know, sometimes people are sending a text and they kind of run out of space, you know, in text number one, so they hit send, and then they continue the text and hit send again, and it's really all just one communication. So is there some minimum amount of time? Because the content of these two that are just so close in time isn't terribly different, it seems. And I'm putting to one side the one that's a day apart. I mean, that strikes me as potentially different, but I just want to focus on, like, is 10 minutes apart enough? Is five minutes apart enough? Your Honor, each case is going to be somewhat fact-specific, but the threat is complete upon its communication, and there may be situations where multiple statements need to be read in context to one another. So my concern is that if we were to accept your argument, then from now until the end of time, the government would be before us saying, well, you know, in the case of Robert Haass, 27 minutes was enough to separate them, and we have 27 minutes here, ergo end of analysis. What else is there here that makes these separate that might make something else separated by 27 minutes not separate, such as perhaps the conversation in the car? Your Honor, in this case, there were two separate threats made about 27 minutes apart. The text message charged in count two threatened the task force officer with death. Then in the one charged in count three, he told the TFO that his anti-American BS is going to get him killed. So there were two separate statements, and when we set out in our brief how the communications unfolded, there were texts in between those that continue to comment on a variety of issues but are not identical to the two separate texts that we charged. And in one of those intervening texts, he threatened a separate group, the text that was sent at about 1051. He threatened a separate group of federal employees in that particular instance. So here we had texts that were separated by time but also contained different content, and the jury found were complete upon their communication and were sent with the requisite intent required by Section 115. So you think that the existence of intervening texts that were not charged, it reminds me of, you know, an intervening arrest or something like that, but not quite. That that's a point that would distinguish this from just sort of one long, and oh, by the way, I also meant to say such and such, which would be a continuation of the thought in the first text. It is significant, Your Honor, in that it underscores that these are separate statements and separate communications. The fact that the task force officer didn't respond to any of them, and he continued making separate and distinct communications throughout that time period, including changing topics in the threat, indicates and underscores that these were separate threats communicated at separate times. So I wonder if you could comment on the penalty anomaly that Mr. Henderson is concerned about, that if somebody, let's say somebody communicates a threat at nine o'clock in the morning and they communicate, you know, a distinctive threat at noon, they'd communicate another one at three o'clock in the afternoon, they'd communicate another one at six o'clock in the evening. So they're all temporarily distinct, but now they've committed four different offenses in the government's view. They're subject to four different penalties, but they haven't actually assaulted or kidnapped or in any other way harmed the person. They just are issuing lots of threats. Doesn't that wind up with a very distorted sentencing structure? You've got the four offenses as opposed to what one assault would carry? No, Your Honor, it's not inconsistent with the statute. And when we look at subsection B4, that penalty provision actually requires that a court or a jury analyze the content of the specific threat when it sets out two different and by drafting section B4 in that manner, Congress is directing the court or the jury to consider the content of each threat, which underscores that the unit of prosecution is each threat as described in that penalty provision. In an instance where someone is charged with multiple counts of making threats, which is what occurred here, there are grouping rules that applied in this case to group those counts by victims. So in terms of the advisory sentencing range, there was no adverse sentencing impact by virtue of charging the tax and separate counts. And as we argued in the brief in response to this point, courts have some discretion in sentencing to impose concurrent sentences and consider the indicated by the words A threat and B4 and the nature of that penalty structure, that each threat is a separate offense. But in terms of sentencing, there are sentencing provisions and tools that courts may use to address any arguable sentencing disparity that a defendant may raise. I would like you, if you, I mean, if you have something else to say on this point, then by all means say it. But I'm also concerned about the point about the jurisdictional basis for this prosecution. Because we have a number of circuits that have been unwilling just to say, as long as the internet is being used, we automatically have both interstate and foreign commerce. Because after all, you know, you could be sitting, you know, up in northern Alberta and probably just as able to access the kinds of things Mr. Chicago or you can for that matter in Russia. But that's a very, very broad way of looking at things. And it seems to me the Supreme Court has cautioned us not to draw too quick an equivalence between the internet world or the cell phone world, if you're thinking of Riley or cases like that, and these statutes. And so, whether you need to find servers in different states or whether you need at a minimum to put an expert on explaining why in order for Mr. Haase's post to reach the Russian website, it had to move somehow in interstate commerce in the United States. There's just no evidence like that at all in this record. And certainly I can think of plenty of states, Illinois might not be one of them, but, you know, if you're in Maine, you can leave the state of Maine and wind up in Canada. If you're in Texas, you can leave the state of Texas and wind up in Mexico. And there's no state in between. It's just purely leaving the state, which is not what the court was telling the jury about. And it's really not what Mr. Haase was charged with. Foreign commerce is not what he was charged with. You could have charged him, but you didn't. And we have an indictment provision in the Constitution. Your Honor, in response to your question, the court has recognized, in some instances, that the internet is an interstate infrastructure. Well, it is. It's a facility, but you didn't charge use of a facility. This statute requires in commerce, in interstate commerce, and the Supreme Court has made it very clear that's a different standard from affecting interstate commerce, and it's a different standard from use of a facility of interstate commerce. In this instance, defendant's use of the interstate, of the internet, including his use of a facility of interstate commerce, was a transmission in interstate commerce. Where's the other end of it? I mean, it starts out where it starts out, but I don't see the proof in this record that there was a stop along the way in a different state of the United States, as opposed to in a different country. By posting statements on a public internet site that is viewable by anyone, he transmitted those posts not only to Russia, but across the country, as the evidence showed by virtue of the fact that the center saw it out in California. There were instances in the record where the defendant responded to his own posts through follow-up comments, either that day or in one instance, a minute apart, and the analyst from the FBI testified that he found the account through a Google search and then looked at the posts on Google and downloaded them for trial. So what happened is when he posted those particular threads, it had a ripple effect. It's like a stone in a pond where it spreads out across state and international lines. No, I understand that, but I'll just leave it at this. It's an argument that will be true in every single case where there is an internet posting. And so there's no longer, in some sense, a jurisdictional hook if the internet is involved in the government's view. Your Honor, I'd add that the court, in a step taken to protect the defendant, also instructed the jury that the internet posts had to cross from inside a state to outside a state. Which, as I was pointing out, could be from inside a state to a foreign country directly. Ms. Kelly, maybe you could unpack this for us because you've made reference to FBI testimony. Pages 179 to 180 of the trial transcript, I believe it's Agent Kostuchowski, talks about Haas coming to the attention of the FBI because of the Simon Wiesenthal Center. They saw postings on a Russian site and they're in California. Then you talked about the FBI seeing the Google searches or his comments. Where is that in the record? One moment, Judge. Even if you could reference, perhaps, who the witness was. Your Honor, it was Analyst Gutierrez in page 9 of our brief. And one of the bullet points refers to the sections of his testimony in the trial transcript, which recited some testimony beginning on page 271, which went through his phone contacts in the internet posts. And he had testified that he found the VK account for a Google search. And even apart from what Analyst Gutierrez testified to, defendant himself testified that the purpose of these posts was to scare law enforcement officials into not investigating him or not visiting him anymore. And that was around page 301 of the transcript. So it most certainly was defendant's intention that the posts be viewable by people beyond Russia and viewable elsewhere so that American federal law enforcement officials would not continue to try to contact him or interview him or in any way investigate him. And are you going to offer a limit to that principle? Judge Wood has inquired about whether there is a jurisdictional hook if the internet is involved. Is there any limit to that? Not in this instance, Your Honor, given the facts of the case and the nature of the disseminations. But when would that not be true of the internet? I mean, suppose I, you know, post a picture of a friend on the internet. Uh, somebody in the United Kingdom could see it, somebody in Japan could see it, somebody in Indiana could see it. Um, that that's just the way the internet works. Um, so I, although I understand your instinct to say, well, not in the facts of this case, I'm having a great deal of trouble imagining a case where you wouldn't be standing here making the same argument. Your Honor, I, I can't think of another example where a major public internet site is used. Uh, as we had mentioned in the jury instruction conference, there may be more limited examples where a cabined server that was cabined geographically might theoretically not travel across state lines. But a situation like this one, where you are using public servers that are captured in Google and national internet platforms, we do believe that that is a transmission in interstate commerce. So would you call it the internet if, uh, say, you know, on the court's VPN, you know, I send an email to Judge Brennan or Judge Kaney, and they send an email back to me, we're all inside this little cocoon of our, of our VPN, or is that not right? Arguably not, Your Honor, because it seems like the communication is cabined more geographically and is not a public communication that's viewable across an internet platform available across states. Of course, because Judge Brennan is in Wisconsin and Judge Kaney is in Indiana. So if I send that message and they happen to be in their home chambers, we've already crossed state lines, even with a private VPN. In that instance, Your Honor, if the communication did cross state lines and contained an actionable threat in violation of Section 875, the government would likely take the position that there was interstate commerce. Okay. We all like each other very much, just so you know. No, I'm not threatening anybody, just, just to be clear. Okay. But it's very disturbing that the government didn't charge interstate or foreign commerce, because it's not that you didn't know from the start that the vk.com site was, was the primary site of interest. Why shouldn't you just have to take that one simple little step, if that's what you mean to charge, charge foreign commerce? Your Honor, I think certainly that will be evaluated going forward, but our position was then and now that defendant's use of the internet in the manner he used it wasn't interstate commerce. There was no objection to the instruction to the jury on the definition, and the jury did find that the communications were made in interstate commerce. That's why I started out with Mr. Henderson with plain error, because even if we were to think that this was an erroneous instruction, as you say, I don't believe anybody, certainly not on this ground, no one raised any kind of objection. And if the record otherwise shows, whether it's the Google searches of Agent Gutierrez, or whether it's the Simon Wiesenthal Center obtaining, and it's critical to me that these things need to be in the record. They can't just be some lawyer standing up at oral arguments saying, oh, you know, everybody can see the internet everywhere. But if we have things in the record, it's conceivable to me that plain error might save you. If the Court doesn't have any more questions about Section 875C, I'll briefly address the grouping argument. Thank you. The District Court did not abuse its discretion in grouping defendants' threat offenses into three groups. In fact, as the record illustrates, defendants threatened far more than three victims. And to the defendants' benefit in this case, the government, the defendant, and the Court agreed to treat the victims as falling into three general categories. The task force officer, other federal officials who might investigate or prosecute the defendant, and another category, a broader category that included society at large. In any... Okay, I thought someone was speaking. In any event, any error in grouping would be harmless in this case. The District Court expressly stated that even if the guidelines had been different, the Court would have imposed the same 51-month sentence due to the seriousness of defendants' threats. As a consequence, we ask the Court to affirm the Court's, the jury's verdicts and sentence in this case. Thank you, Ms. Kelly. Mr. Henderson, I'll give you another minute in addition to the time you had. Thank you, Your Honor. I wanted to start just by reiterating a point Judge Wood just made, which is about we need evidence in the record. It's the government's burden to prove these things beyond a reasonable doubt. How the internet works is mysterious to me as well, but when Mr. Haas transmitted his threat in foreign commerce to Russia, he did not thereby transmit it to everybody else. VK.com retransmitted the threat. It provided a forum, and it then made new connections with users who wanted to access it. They're called DMCA notices, the Digital Millennium Copyright Act. You see that Congress has established liability not just for creating the content and posting it on the internet, but also for sites like Google that will re-host it or that will provide links to it. There's a distinction between the initial transmission, which establishes the criminal liability, and then a further later communication that's outside of Mr. Haas's control. Mr. Henderson, let's back up just one step, though, because here Judge Wood has pointed out that the context that we get to this point of the definition, that was being done in the light of a jury instruction conference with a pro se defendant, and now the defense is in a position of the district court, the government, for somewhat accommodating the defendant in that definition in a manner that would advantage the defendant. I assume that's why Ms. Kelly attached appendix pages one through four, to show the lead up at the jury instruction conference as to how this definition occurred. Does that put the defense in an awkward position a bit? Well, sure. We're on plain error. I mean, it would have been better to object. The main point I suppose I want to make is that at trial, I don't think you can read this transcript to mean anything other than reliance on the fact that it went Illinois to Russia. That's foreign commerce. And that's a constructive amendment, regardless of what the jury instructions were, regardless of whether more should have been said about that. That's Sterone versus United States, when you allege one basis of jurisdiction and prove another to get a verdict, that the proof doesn't conform to the charges. It's a Fifth Amendment violation, so we would ask that the convictions be vacated on that basis. Thank you. Thank you, Mr. Anderson. Thank you, Ms. Kelly. And the case will be taken under advisement.